J-S03045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: A.J.B., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.E.B., MOTHER | |
| | No. 2714 EDA 2014 |

Appeal from the Order Entered July 30, 2014
In the Court of Common Pleas of Northampton County
Orphans' Court at No(s): No. 2013-0044

BEFORE:  FORD ELLIOTT, P.J.E., PANELLA, J., and OTT, J.

MEMORANDUM BY OTT, J.:                        **FILED JANUARY 28, 2015**

A.E.B. (Mother) appeals from the order entered July 30, 2014, in the Court of Common Pleas of Northampton County, involuntarily terminating her parental rights to her son, A.J.B. ("Child"), born in July of 2009.  We affirm.[1]

The record reveals the relevant factual and procedural history, as follows.  Since Child was seven months old, he has been cared for by

_____

[1] The identity of Child's father is unknown.  It does not appear from the record that a petition to terminate John Doe's parental rights was filed or that John Doe's rights were terminated by a previous court order. Additionally, the petition to involuntarily terminate Mother's parental rights does not indicate whether a claim of paternity has been filed, as required by 23 Pa.C.S.A. § 2512(c).  We note that, generally, a minor may not be adopted unless his or her natural parents consent, or their parental rights have been terminated.  23 Pa.C.S.A. §§ 2711(a)(3), 2714.

Mother's cousin, D.G. ("Adoptive Father"), and his wife, D.G. ("Adoptive Mother") (collectively, "Adoptive Parents"). By order dated June 15, 2010, Adoptive Parents were appointed temporary guardians of Child by a court in Orange County, New York.[2] The same court later appointed Adoptive Parents permanent guardians by order dated November 17, 2010. On June 26, 2013, Adoptive Parents filed a petition to involuntarily terminate Mother's parental rights to Child.

A termination hearing was held on December 24, 2013. Mother was incarcerated in New York at the time of the hearing, and participated by phone. Mother was not represented by counsel. That same day, the orphans' court entered an order terminating Mother's parental rights. On January 28, 2014, Adoptive Parents filed a petition for adoption of Child.

On January 27, 2014, the orphans' court received a letter from Mother, dated January 17, 2014, in which she requested an appeal. The court treated this letter as a notice of appeal. By order dated January 31, 2014, the court appointed counsel to represent Mother. On March 19, 2014, Mother filed a praecipe to discontinue her appeal in this Court, and the appeal was discontinued. On March 26, 2014, by agreement of the parties, the orphans' court vacated its prior order terminating Mother's parental

---

[2] The record reveals that Adoptive Parents have resided in Pennsylvania since at least 2007. However, Child may have lived with Mother in New York for an unknown period of time after his birth.

rights and scheduled a new termination hearing. The court also appointed a guardian *ad litem* ("GAL") to represent Child.

A new termination hearing was held on July 28, 2014, during which Mother continued to be represented by counsel. The orphans' court heard the testimony of Adoptive Father, Adoptive Mother, and Mother. The court also listened to a statement from GAL. On July 30, 2014, the orphans' court entered the subject order involuntarily terminating Mother's parental rights to Child. On August 15, 2014, Adoptive Parents again filed a petition for adoption of Child. Mother timely filed a notice of appeal on August 29, 2014, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother presents the following issues for our review:

1. Did the [orphans'] court err[] in finding that Mother has not performed the duties of a parent to Child for a period of approximately thirty-eight months immediately preceding the filing of the Petition to terminate Mother's parental rights?

2. Did the [orphans'] court err[] in finding that Mother failed to exert a reasonable firmness in attempting to visit and parent [C]hild?

3. Did the [orphans'] court err[] in finding that Mother has, since April 2010, demonstrated a clear disinterest in Child?

4. Did the [orphans'] court err[] in finding that Mother has failed to take reasonable steps expected of a parent in fulfilling the affirmative duty to perform her parental obligations?

5.      Did the [orphans'] court err[] in finding Mother made little to no effort to maintain a relationship, or regular contact, with Child?

6.      Did the [orphans'] court err[] in finding Mother has not performed her parental duties since April 2010?

7.      Did the [orphans'] court err[] in finding that Mother has, by conduct continuing for a period of at least six months immediately prior to the filing of the Petition, evidenced a settled purpose of relinquishing parental claim to Child?

8.      Did the [orphans'] court err[] in finding that Mother has, by conduct continuing for a period of at least six months immediately prior to the filing of the Petition, refused or failed to perform parental duties?

9.      Did the [orphans'] court err[] in finding that there is no bond between Mother and Child?

10.    Did the [orphans'] court err[] in finding that termination of Mother's parental rights is in the best interest of Child's developmental, physical, and emotional needs, as well as his overall welfare?

11.    Did the [orphans'] court err[] in not considering [Adoptive Parents'] ongoing attempts to prevent and/or restrict Mother's ability to parent Child when rendering its decision?

Mother's brief at 6-7 (suggested answers omitted).[3]

---

[3] While Mother lists eleven claims for our review, her brief contains a single argument section, in violation of our Rules of Appellate Procedure. ***See*** Pa.R.A.P. 2119(a) (providing that the argument "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.").

We review the orphans' court's order according to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

- 5 -

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(1) and (b), which provide as follows:

   **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

      (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

   **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the

- 6 -

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1) and (b).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citing **In re Adoption of R.J.S.**, 901 A.2d 502, 510 (Pa. Super. 2006)). Further,

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

**Id.** (quoting **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998)).

In **In re Adoption of S.P.**, **supra**, our Supreme Court discussed **In re Adoption of McCray**, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of

- 7 -

incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1).  The **S.P.** Court stated:

> Applying in **McCray** the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." **Id.** at 655.  We observed that the father's incarceration made his performance of this duty "more difficult." **Id.**

**In re Adoption of S.P.**, 47 A.3d at 828.  The **S.P.** Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment.  Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration.  Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.  Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> [**McCray**] at 655 (footnotes and internal quotation marks omitted). . . .

**In re Adoption of S.P.**, *supra*; *see also* **In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (internal citations omitted) (stating that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child").

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child.  In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated,

- 8 -

"Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Mother argues that the orphans' court erred in terminating her parental rights because Adoptive Parents prevented her from maintaining a relationship with Child. Mother's brief at 15. Mother claims that Adoptive Parents threatened her with legal action should she ever attempt to contact Child, and that her failure to remain an active participant in Child's life was through no fault of her own. *Id.* Mother asserts that she made an effort to develop a relationship with Child by filing a custody petition and by scheduling a visit with Child at which Adoptive Parents failed to appear. *Id.*

In its opinion accompanying the order terminating Mother's parental rights, the orphans' court found as follows:

In this case, it is clear that Mother has "evidenced a settled purpose of relinquishing [her] parental claim to [Child and] has refused [and] failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1). Essentially, Mother voluntar[ily] relinquished custody of Child to Petitioners in April 2010 and has not visited him, contacted him, provided support for him, or spoken to him since. Mother offered no credible excuse for her abandonment of Child.

> Mother's conduct does not satisfy her affirmative duty to use all available resources to preserve her parental rights. Mother has not made a genuine effort to maintain contact and association with Child. Mother has not acted "affirmatively, with good faith interest and effort, to maintain the parent-child relationship." *In re Burns*, 379 A.2d [535, 541 (Pa. 1977)]. Our Superior Court has held that "[p]arental rights are not preserved . . . by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs." *In Re Shives*, 525 A.2d 801, 804 (Pa. Super. 1987). Thus, [Adoptive Parents] have clearly and convincingly established that Mother's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)(1).

Orphans' Court Opinion, 7/30/2014, at 6-7. The testimonial evidence supports the court's findings, as follows.

Adoptive Father testified that he and Adoptive Mother began caring for Child after Mother abandoned Child and left him in the care of his maternal grandmother in Virginia. N.T., 7/28/2014, at 13-14. Adoptive Father explained that Mother did not object to him and Adoptive Mother gaining custody of Child as a result of the proceedings in New York. *Id.* at 14. To the contrary, Mother stated that "she didn't care what happened to him. She didn't care what we did. She didn't want him anymore," and Mother was glad that Adoptive Parents were taking Child. *Id.* at 12. Adoptive Father testified that, to his knowledge, Mother had been out of prison for most of the time that Child was residing with him and Adoptive Mother. *Id.* at 10-11. Nonetheless, Mother had not had any contact with Child during this time. *Id.* at 11-13. Adoptive Father stated that he had done nothing to

- 10 -

prevent Mother from having contact with Child. *Id.* at 12. He noted that his address and phone number have not changed since Child began to live with him. *Id.* at 12-13.

On cross-examination, Adoptive Father admitted that Mother filed a petition in New York requesting visitation with Child in 2011. *Id.* at 14-15, 23. However, he explained that Mother "was given stipulations that she verbally said she was not going to follow, and there was no visitation made. We were travelling almost 120 miles to bring him to see her. We had agreed to that. And she didn't do what she was supposed to do." *Id.* at 14-15. Adoptive Father denied that there was a visit scheduled at which he failed to appear or produce Child. *Id.* at 15. Adoptive Father stated that Mother also filed a petition in Northampton County, but that Mother was not granted visitation as a result of this petition. *Id.*

Adoptive Mother testified that Mother had no contact with her from 2011 until after the petition to terminate her parental rights was filed. *Id.* at 26-27. Additionally, she confirmed that Mother had not had any contact with Child. *Id.* at 22-23. Adoptive Mother testified that she told Mother that she could visit with Child in Adoptive Parents' home, but that Mother never took her up on this offer. *Id.* at 23-24. Adoptive Mother explained that she had attempted to help Mother by suggesting that she attend a job program near Adoptive Parents' home, but that Mother rejected this assistance. *Id.* at 24-25.

Adoptive Mother also testified to the events surrounding Mother's request for visitation with Child in 2011. *Id.* at 20-22. Adoptive Mother explained that Mother was granted supervised visitation with Child. *Id.* at 20-21. A supervised visit was being scheduled, but Mother cancelled it. *Id.* at 21. Mother then requested another visit so that she could take Christmas pictures with Child. *Id.* However, the day before the visit was to take place, Mother called and cancelled again, saying that she had to attend a dentist appointment. *Id.* at 22. According to Adoptive Mother, she "never heard from [Mother] again." *Id.*

Mother testified that she agreed to give Adoptive Parents temporary guardianship of Child in 2010, because she anticipated that she would soon be incarcerated as a result of a criminal charge. *Id.* at 31, 41. As a result of this charge, Mother spent seven days in jail. *Id.* at 41. Mother stated that she next went to jail in April of 2012, and received a two year sentence in October of 2013. *Id.* at 40-42. Mother claimed that, after her release from jail in 2010, she attempted to regain custody of Child. *Id.* at 31. Specifically, Mother asserted that she called Adoptive Mother, but that Adoptive Mother refused to return Child and directed Mother not to call her anymore. *Id.* at 32. Mother did not recall when this conversation took place. *Id.* Mother admitted that "I never called again," but stated that she instead drove to Adoptive Parents' house. *Id.* Upon discovering that no one

was home, she filed a visitation petition in Northampton County. ***Id.*** She testified that nothing ever happened with regard to the petition. ***Id.*** at 33.

Mother testified that she was eventually granted supervised visitation by a court in New York during "the end of 2010." ***Id.*** at 33-34. According to Mother, this resulted in two scheduled visits with Child. ***Id.*** at 34-36. Mother stated that she was unable to attend one visit because of an orthodontic emergency. ***Id.*** at 34. She claimed that Adoptive Parents failed to appear for the second visit. ***Id.*** at 35. Mother admitted that she never attempted to schedule any other visits, and "gave up." ***Id.*** at 35-36. Mother also conceded that she had not had made any other attempt to contact Child since that time, other than purportedly sending Child a letter from jail. ***Id.*** at 38-39.

Thus, the testimonial evidence demonstrates that Mother refused or failed to perform parental duties for a period far in excess of six months prior to the filing of the petition to terminate her parental rights on June 26, 2013. At best, Mother last made an attempt to have contact with Child in early 2011. Meanwhile, at the time of the termination hearing, Child had just turned five, and had been residing with Adoptive Parents since he was seven months old. ***Id.*** at 7-8. It is clear that Mother has not made a good faith effort to maintain a place of importance in Child's life. As such, Mother's conduct warrants termination pursuant to Section 2511(a)(1).

Having determined that the orphans' court properly terminated Mother's parental rights pursuant to Section 2511(a)(1), we now review the order pursuant to Section 2511(b). With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, the Court directed that, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

The orphans' court found as follows:

. . . . The [c]ourt finds that Mother and Child do not have an emotional bond, let alone any bond. By her own testimony, Mother has not seen or even spoken with Child for over four years. Child refers to [Adoptive Parents] as "Daddy" and "Mommy."

Given that Mother has not seen or spoken with Child in over four years and that Child has formed a strong and healthy parent/child bond with [Adoptive Parents], the [c]ourt finds that permanently severing the relationship between Mother and Child

- 14 -

would not have a negative effect on Child. Rather, given all of the factors stated above, the [c]ourt must conclude that Child's developmental, physical and emotional needs, as well as Child's welfare would best be served by the termination of Mother's parental rights to Child and Child's adoption by [Adoptive Parents].

Orphans' Court Opinion, 7/30/2014, 8-9 (footnote omitted). Again, the testimonial evidence supports the court's findings.

Adoptive Father testified that it was his intention to adopt Child. N.T., 7/28/2014, at 12. He stated that Child looks to him and Adoptive Mother to provide comfort when he is upset, and that they meet Child's daily needs for housing and food. *Id.* at 16-17. Child refers to Adoptive Father and Adoptive Mother as "Daddy" and "Mommy." *Id.* Adoptive Father testified that Child would not recognize Mother if he saw her. *Id.* at 17. Adoptive Mother noted that Child does not ask about Mother. *Id.* at 19. GAL stated that he had interviewed Child, and that it was obvious that Child was bonded with Adoptive Parents, and refers to them as his mother and father. *Id.* at 43-44. In contrast, GAL stated that Child has no knowledge or memory of Mother. *Id.* GAL expressed his belief that it would be in Child's best interest to be adopted by Adoptive Parents. *Id.* at 44.

Based upon this evidence, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(b). While Mother argues that a bonding assessment should have been performed to determine what impact the termination of Mother's parental rights might have on Child, it is well-settled that a bonding assessment is

not required to support a termination order.  Mother's brief at 16; ***In re B.C.***, 36 A.3d 601, 611 (Pa. Super. 2012).

Accordingly, we affirm the order involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/28/2015